UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PARIS WILLIAMS,

       Plaintiff,

v.

SERRA CHEVROLET AUTOMOTIVE, LLC
and DON TAILOR,

       Defendants.

_____/

Case No. 12-11756

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [41]**

This employment discrimination and retaliation lawsuit arises out of the at-will employment of Plaintiff Paris Williams as a lube technician for less than one month (December 5, 2011 through January 4, 2012) at Defendant Serra Chevrolet Automotive, LLC ("Serra Chevrolet").  Defendant Don Tailor was the Serra Chevrolet service manager and Plaintiff's supervisor during her short employment at Serra Chevrolet.  Plaintiff's daily job performance, however, was supervised by lube technician "crew leaders" Michael Patterson and Mitch Cotto, who were assigned the task of training new lube technicians during this time period.  These crew leaders reported to Defendant Tailor.  After multiple reports that Plaintiff was insubordinate when told to wear her safety goggles and to follow Serra Chevrolet protocol for lube technician tasks, Plaintiff was terminated less than 30 days into her 120-day "Introductory Period" of at-will employment at Serra Chevrolet.  Plaintiff subsequently filed this lawsuit alleging claims of gender discrimination under Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, and under Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2201, *et seq.*, and alleging claims of retaliation under both Title VII and the ELCRA.

This matter is now before the Court on Defendants' motion for summary judgment. Defendants' motion is GRANTED because Plaintiff has not presented any admissible evidence of gender-based disparate treatment to sustain her discrimination claims or sufficient evidence to permit a reasonable inference that the "desire to retaliate was the but-for cause" of her termination or that Defendants' lawful reasons for termination were a pretext for retaliation. *See University of Texas Southwestern Medical Center v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517, 2526, 2528 (2013); *Nicholson v. City of Clarksville*, 530 F. App'x 434, 448-449 (6th Cir. 2013).

## I.   Background

### A.   Plaintiff's Job Performance After December 5, 2011 Start Date

Plaintiff was hired by Serra Chevrolet as a lube technician and started working on December 5, 2011.  (Defs.' Mot., Ex. 1, Pl.'s Dep. at 22.)  She does not dispute that she was an at-will employee as expressly stated in her employment application and the employee handbook she was provided by Serra Chevrolet.  (*Id.* at 153; Defs.' Mot, Ex. 2, Pl.'s Application at 2; Defs.' Mot., Ex. 3, Serra Chevrolet Handbook at 2.)  Plaintiff was hired by Defendant Tailor as a lube technician.  (Defs.' Mot., Ex. 6, Tailor Dep. at 19.)  At the time, Serra Chevrolet was opening a new, larger facility that required more staff, including lube technicians, who would be trained and moved to the new facility when it opened on January 16, 2012.  Plaintiff was one of those newly hired lube technicians.  (*Id.* at 19-22, 24; Defs.' Reply, Ex. 4, Brown Dep. at 18.)

2

Defendant Tailor was Plaintiff's direct supervisor, but Michael Patterson and Mitch Cotto were the lube technician "crew chiefs" or "crew leaders" tasked with monitoring her performance on the jobs she was assigned.  (Tailor Dep. at 28.)  In addition to training and supervising new lube technicians, the crew leaders also performed lube technician duties.  (Defs.' Mot., Ex. 9, Patterson Dep. at 20.)  Crew leaders did not have the authority to discipline, hire, or fire lube technicians; rather, they reported any performance problems to the service manager, Defendant Tailor.  (*Id.* at 22; Defs.' Mot., Ex. 8, Cotto Dep. at 12-14.)  Immediately upon learning that Serra Chevrolet had hired its first female lube technician, Greg Brown, Serra Chevrolet's general manager, contacted the builder of the new facility and ordered that the existing plans be altered to add a female locker room.  (Brown Dep. at 20-21, 26, 39-41.)

Both crew leaders – Michael Patterson and Mitch Cotto – had problems with Plaintiff's work performance, her defiance in following directions, her inability to work as a team with the lube technicians, and acts of insubordination that they reported to Defendant Tailor.  Specifically, crew leader complaints included Plaintiff's repeated failure to and questioning why she had to wear safety glasses when performing tasks, her repeated resistance to performing tasks in the manner Serra Chevrolet lube technicians were trained, and her rebellious attitude and resistance when assigned clean-up tasks that included a tire changing machine – tasks that the crew leaders and all lube technicians performed.  (Cotto Dep. at 17-24, 25-27,  31, 33, 35-37, 40-42; Patterson Dep. at 22-23, 24-33, 39-40, 42-43, 44-50, 52-54, 64-68; Tailor Dep. at 32-34, 39-40.)  Others personally witnessed Plaintiff not wearing her safety glasses in the proper manner when working. (Tailor Dep. at 32, 52; Defs.' Mot., Ex. 7, DeCarlos Colley Dep. at 10-12.)

3

Plaintiff concedes that every day Patterson told her that she was not performing a task the right way – that Serra Chevrolet does it different. (Defs.' Mot., Ex. 1, Pl.'s Dep. at 70.) She testified that she got in trouble for everything that she didn't do that Patterson told her to do. (*Id.* at 53.) Plaintiff admits that she questioned the Serra Chevrolet method of doing things, like starting tire rotations from the left rear tire, that crew leaders Patterson and Cotto would tell her to follow the Serra Chevrolet method, and that they would tell Defendant Tailor if she didn't follow Serra Chevrolet procedures. She questioned crew leader Patterson's and Cotto's authority over her yet acknowledged that they had been at Serra Chevrolet longer than the new hires like her and acknowledged that it was their job to show everyone "the ropes" at the dealership. (*Id.* at 85-87.) She admits that she complained about Serra Chevrolet's policy of wearing safety glasses. (*Id.* at 168.) She concedes she voiced her opinion if Serra Chevrolet procedures differed from that of her past employer. (*Id.* at 182-185.) She complained that her time at Serra Chevrolet was more like a boot camp rather than a job because she was reprimanded if she talked to other employees and other employees would get reprimanded if they talked to her while she was working. (*Id.* at 53-54, 73.)

Plaintiff testified that, although he never told her so, she believed crew leader Patterson disliked her because he saw she could do his job better than him and Patterson thought Plaintiff was after his job. (*Id.* at 60-62, 90-91.) She formed this belief because Patterson told her to clean a tire machine that Plaintiff felt didn't need to be cleaned, ever; repeatedly told her that she was not doing her job properly; and sent her to retrieve a car from the dealership lot two or three times with an identification tag that had the wrong set of keys, an act that Patterson claimed was a mistake but Plaintiff believes was intentional

4

because she claims it never happened to anyone else.  (*Id.* at 55-56, 57-58, 61-62, 70-71, 75, 78-79, 82-83, 85-86, 88-89.)

### B.  December 19, 2011 Meeting

On December 19, 2011, Plaintiff went to Defendant Tailor's office to talk to him but saw that he had someone else in his office and left without speaking to him.  (*Id.* at 91-92.) Sometime later in the day, Plaintiff saw, but could not hear, Patterson talking with Defendant Tailor and pointing in her direction.  Shortly thereafter, Michael Patterson informed Plaintiff that Defendant Tailor wanted to see her in his office.  (*Id.* at 91-92, 98-99.)

Plaintiff testified that Defendant Tailor conducted the approximately 15 minute meeting on December 19th, and that she, Patterson, Tailor and an unnamed white, male assistant service manager were in attendance.  Tailor started the meeting by telling Plaintiff that he had heard some complaints about her work performance, i.e., that things were not being done appropriately and Plaintiff was not wearing her safety goggles.  Tailor explained that he had called the meeting to discuss these complaints so that everyone could "get along" and  work as members of a team.  He told Plaintiff that Michael Patterson was responsible for showing the new lube technicians the ropes -- Serra Chevrolet procedures.  (*Id.* at 93-95, 161, 181.)  Patterson did not comment during the meeting, but Plaintiff did.  She testified that she told Tailor that she was upset with the tasks that Patterson assigned her (*id.* at 65) and that Michael Patterson and Mitch Cotto often gave her conflicting instructions (*id.* at 95).  For the first and only time, Plaintiff reported to Tailor that she felt she was being treated differently because she was a woman (*id.* at 54, 84, 91-92).  Tailor responded, in a louder voice but not yelling, that he disagreed with Plaintiff's claim -- that Serra Chevrolet

5

does not discriminate, that she was not being treated differently; rather, they were just trying to get all the employees to work together and get along. Plaintiff felt that she wasn't given the opportunity to explain how she was being treated differently. (*Id.* at 96-98.) After she left Tailor's office, the others stayed behind. (*Id.* at 98-99.) Plaintiff concedes that this was the only time she raised her gender discrimination claims with a superior at Serra Chevrolet, and that despite being provided the step-by-step process for raising those issues with others at Serra Chevrolet, Plaintiff failed to do so. (*Id.* at 154-159.)

Tailor's and Patterson's recollection of the December 19th meeting is somewhat different than Plaintiff's. Tailor recalls that the purpose of the meeting was to address both Patterson's concerns with Plaintiff and vice versa, to get them to listen to each other's concerns, and to get them to work together as a team. Patterson's concern with Plaintiff was that she was insubordinate and demonstrated a bad attitude when he assigned her tasks. Tailor recalls that Plaintiff was able to convey her side of the story. Her concern with Patterson was the way he talked to her and that he "acts like he's my daddy." Tailor responded to both -- he stressed to Plaintiff the necessity for her to carry out the tasks that were given to her and told Patterson to be sensitive to how Plaintiff claimed he was coming across to her. (Tailor Dep. at 44-48.) Although Tailor felt that the December 19th meeting ended on a more positive note, he described Plaintiff's tone (raised voice) and what she was saying in that meeting to be defiant, very forceful, and insubordinate. (*Id.* at 48-51.) Tailor denies ever hearing any comments or having any discussions with anyone about Plaintiff being treated less favorably because she was a woman at any time during or after her employment. (*Id.* at 62-63.)

6

Patterson recalls a meeting in Tailor's officer where he, Tailor, and Plaintiff were present but does not recall the date.  The following events precipitated that meeting. Plaintiff had become upset with Patterson after he instructed her to clean the tire changing machine in the lube area and cleaned it only after being repeatedly told to do so.  Patterson reported this to Tailor, and Tailor had Plaintiff and Patterson come to his office to discuss the matter.  Plaintiff told Tailor that she felt that Patterson was treating her unfairly and like a child, and Tailor told her to stop right there before she said something unprofessional. Patterson left the room after that, and Tailor and Plaintiff remained in Tailor's office for a couple of minutes.  Patterson testified that he asked Plaintiff to clean the tire changing machine only once, and he and other employees had cleaned the tire changing machine many times before and after Plaintiff did.  Patterson also testified that he never asked Plaintiff to perform a task that he wouldn't do himself or wouldn't ask a male employee to do, that he never assigned Plaintiff a task because she was female,  that he tried to treat all the employees that he was assigned to train fairly and equally, that his complaints to Tailor about Plaintiff had nothing to do with the fact that she was female, and that he had in fact complained to Tailor about male employees.  (Patterson Dep. at 25-26, 33-45, 65-68, 71.)

### C.  Plaintiff's Termination on January 4, 2012

After the December 19, 2011 meeting with Tailor, Patterson, and Plaintiff, Patterson continued to report to Tailor complaints about Plaintiff's job performance; specifically, her inability to perform her job in the appropriate manner.  (Tailor Dep. at 48-49.)  On January 4, 2012, Plaintiff was terminated.

7

After the December 19. 2011 meeting, another Serra Chevrolet employee, DeCarlos Colley, who worked as a service technician during the same period of time that Plaintiff worked as a lube technician, came to Defendant Tailor to discuss Plaintiff.  Colley told Tailor that he was concerned that Plaintiff was setting Serra Chevrolet up to be sued. Colley did not explain to Tailor what type of lawsuit Plaintiff had in mind.  He just conveyed his concern that Serra Chevrolet was being "set up."  (Tailor Dep. at 34-37, 47, 48-49.)

In his deposition, Colley testified that he witnessed Plaintiff not wearing her safety glasses, heard her comment that she did not want to wear them, heard her question Serra Chevrolet procedures and claim that she had a better way, and heard her complain about clean-up duties like cleaning the tire machine that he and others did as well.  Also, based on his personal observations of Plaintiff's disrespectful attitude toward and questioning of Patterson when he told her to wear her safety goggles and to clean the tire machine, he considered Plaintiff to be insubordinate to her superiors.  When Plaintiff complained about her job responsibilities, Colley told her that it was her job to do it the way she was trained to do it at Serra Chevrolet.  He also testified that Plaintiff never told him that she was having issues with Michael Patterson or felt he was singling her out, he never saw or heard Plaintiff being asked to do something that other male workers in her department were not asked to do, and he saw no evidence of her being treated differently than her male co-workers.  (Colley Dep. at 10-12, 14-15, 16-19, 21, 24-31.)

The same day that Colley came to Tailor, Tailor went to Greg Brown, the general manager of Serra Chevrolet, Southfield.  (Tailor Dep. at 37, 56.)  During his approximately 10 minute meeting with Brown, Tailor discussed all of Plaintiff's job performance issues that Patterson had reported to him.  He also reported Colley's concern that Plaintiff was setting

8

Serra Chevrolet up to be sued.  (Tailor Dep. at 49-50.)  Brown recalled that he and Tailor discussed complaints about Plaintiff's insubordination, her performance problems, and that Tailor had heard from another employee that "at any opportunity she could find to sue us or take advantage of us, [Plaintiff] was going to" and the decision was made to terminate her as an at-will employee.  Based on her job performance and insubordination issues, Plaintiff was not considered for any other position at Serra Chevrolet.  (Brown Dep. at 34-39, 44-47.)  Brown denies that Plaintiff's termination had anything to do with the fact that she is a woman, is unaware of any evidence of disparate treatment of Plaintiff because of her gender while she was employed at Serra Chevrolet, and denies that Tailor mentioned anything about Plaintiff's gender or even that she was not "fitting in with the guys" in connection with their discussion about her termination.  (Brown Dep. at 41-42.)

 As service manager, Defendant Tailor had the authority to terminate employees that he supervised after first consulting with general manager Greg Brown.  (Tailor Dep. at 13-14; Brown Dep. at 11, 14.)  After hearing from Tailor, Brown instructed Tailor to terminate Plaintiff with the explanation that she was an at-will employee.  (Tailor Dep. at 37-38, 53-55, 58; Brown Dep. at 32-33.)  Tailor was instructed to have Sheryl Neville, Serra Chevrolet's controller who is tasked with dealing with employee terminations, be present when he provided Plaintiff with her notice of termination.    (Tailor Dep. at 57; Defs.' Mot., Ex. 5, Neville Aff., ¶¶ 1-6.)  Based on Plaintiff's poor job performance, Tailor agreed that the decision to terminate Plaintiff was fair and denies that her gender had anything to do with her termination.  (Tailor Dep. at 59, 63.)

 Ms. Neville was present at the January 4, 2012 meeting where Plaintiff was informed that Serra Chevrolet was exercising its rights as an at-will employer and was terminating

9

her employment.   (Neville Aff. at ¶ 6.)   Plaintiff and Tailor were the only other two individuals present at that termination meeting held in Tailor's office.  (Tailor Dep. at 57.)

Plaintiff testified that, on January 4, 2012, crew leader Mitch Cotto came and told her that Tailor wanted to see her in his office.  Plaintiff went to his office and Tailor told her that "under the Serra law, that they can say who stays or goes.  And that they felt I should go and he was letting me go."  (Pl.'s Dep. at 218-219.)  When asked to sign the Notice of Termination that was presented to her, Plaintiff refused.  (*Id.* at 218.)  Prior to her termination, Plaintiff had received verbal reprimands but no written reprimand.  (Tailor Dep. at 50.)

### D.  Serra Chevrolet Handbook

Plaintiff concedes that she received a Serra Chevrolet Handbook when she started working at Serra Chevrolet (Pl.'s Dep. at 152).  That Handbook, expressly provides that all Serra Chevrolet employees are "at-will" employees subjected to a 120-day introductory or probationary period:

> All our employees are considered to be employed on an "at will" basis.  Your status as an "at will" employee may not be changed except by a written agreement signed by the General Manager specifically acknowledging the change in your status.
>
> * * * * *
>
> For every new employee, the first one-hundred and twenty (120) days of full-time employment is an introductory period for both you and the Dealership.  During this time, you will have the opportunity to learn about the Dealership, your job, and your new surroundings and to decide if this is the place for you.
>
> At the same time, we will be reviewing your job performance, attendance, attitude, relationship and overall interest in your job, to determine if you are the right fit for us.  At the end of this period, we will then make a decision concerning your continued employment.  Of course, should an employee's performance

10

become unsatisfactory at any time during this trial period, the employee will be subject to discharge at that time.

(Defs.' Mot., Ex. 3, Serra Chevrolet Handbook at 2, 8).

### E.  Plaintiff's Subsequent Lawsuit

Plaintiff hired an attorney on January 5, 2012 (*id*. at 179-80), filed an EEOC complaint alleging gender-based disparate treatment and retaliation in violation of Title VII on January 10, 2012 (Compl., Ex. A), received a right-to-sue letter on February 7, 2012 (Compl., Ex. B), and filed this lawsuit on April 29, 2012.

## II.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

11

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

### A.  Title VII and ELCRA Claims of Gender-Based Disparate Treatment

Plaintiff's gender-based discrimination claims are brought under both Title VII and Michigan's ELCRA.  "Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases."  *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).  Gender discrimination claims can be established by either direct or circumstantial evidence.  *Vredevelt v. The GEO Group, Inc.*, 145 F. App'x 122, 127 (6th

12

Cir. 2005).  Plaintiff does not present any direct evidence of gender discrimination, and thus the familiar *McDonnell Douglas* burden-shifting framework applies.  *Id.* (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Under this framework, the burden of production shifts, but Plaintiff "continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate."  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006).

Plaintiff may establish a prima facie case of gender-based disparate treatment by showing that she:  (1) is a member of a protected class, (2) was subjected "to an adverse employment action," (3) was "qualified for the job, and (4) treated differently than similarly situated male employees for the same or similar conduct."  *Humenny*, 390 F.3d at 906; *Vredevelt*, 145 F. App'x at 127.  If Plaintiff "establishes a prima facie case of gender discrimination, the burden of production shifts to the defendant to provide a legitimate, non-discriminatory reason for the employment action."  *Humenny*, 390 F.3d at 906.  If the defendant employer satisfies this burden of production, "the plaintiff must then produce evidence that the defendant's proffered reason is a pretext for discrimination."  *Id.*

Defendants' motion argues that Plaintiff cannot establish the fourth element of her prima facie case, i.e., that similarly situated male co-workers were treated more favorably, and even if she could, she cannot establish that her employer's legitimate non-discriminatory reasons for her termination were a pretext for gender discrimination.  This Court agrees with Defendants.

### 1.  No Evidence that Similarly Situated Male Co-Workers Treated Better

13

Plaintiff claims that she was discriminated against because of her gender and was treated differently than her similarly situated male co-workers.  Specifically, Plaintiff claims that, unlike her, her male co-workers:

- never had to clean a tire changing machine or do tasks that Plaintiff considered "busy work" (Pl.'s Dep. at 55-56, 75-79, 82, 88-89);

- never got in trouble for not following crew leaders Michael Patterson's or Mitch Cotto's instructions on Serra Chevrolet procedures like wearing safety glasses or performing tire rotations or other lube technician tasks (*id.* at 53, 62, 86, 88-89, 95, 169);

-  never had to retrieve a car from the dealership parking lot with a tag that sometimes had the wrong car keys (*id.* at 57-58, 85-86, 211-12); and

- had a locker room in the old Serra Chevrolet facility where she worked (*id.* at 125-27).

Plaintiff also complains that:

- Patterson would reprimand and report to Tailor when a male co-worker was talking to Plaintiff while she was working and vice versa (*id.* at 54, 73, 124, 215);

- sometimes crew leaders Patterson and Cotto would not share their personal power tools with her (*id.* at 88-90); and

- crew leader Patterson would sometimes watch her perform a lube technician task on her own rather than help her (*id.* at 212).

Other than her inadmissible subjective opinion and beliefs, Plaintiff presents no evidence that similarly situated male co-workers received more favorable treatment than her.  She conceded this fact numerous times in her deposition testimony.  (Pl.'s Dep. at 59-62, 96, 103, 116-17, 121-25, 128-29, 134-38).  To be considered similarly situated, "the

14

individuals whom [Plaintiff] compares herself must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Humenny*, 390 F.3d at 906 (internal quotation marks and citations omitted). Plaintiff has not come forward with any admissible evidence of favorable treatment of males who satisfy this definition of "similarly situated."

Contrary to Plaintiff's subjective opinion and belief, crew leaders Patterson and Cotto as well as another co-worker testified that the tire changing machine was cleaned often, that they all had done it, and this was a task that all lube technicians and even Tailor has performed, not just Plaintiff. (Colley Dep. at 16-19, 26-27; Cotto Dep. at 25-27, 32-33, 35-36; Patterson Dep. at 24-28, 34-35, 39-40, 42-45, 65-68; Tailor Dep. at 32-34, 39-41.) Plaintiff has not come forward with any admissible evidence that she was treated less favorably with regard to cleaning tasks like this. Her subjective opinions and beliefs are insufficient to create a genuine issue of material fact on the disparate treatment element of her *prima facie* gender discrimination case. *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008).

Likewise, despite Plaintiff's subjective opinion and belief that she was singled out for failing to follow Serra Chevrolet protocol, including properly wearing her safety goggles on her eyes when required, there is ample evidence that she repeatedly failed to follow Serra Chevrolet rules, that she resisted and challenged crew leaders when reminded to follow Serra Chevrolet protocol, and that other trainee lube technicians were similarly reprimanded by crew leaders Patterson and Cotto under similar circumstances. (Cotto

15

Dep. at 17-24, 31, 35-37, 39-40, 40-43; Patterson Dep. at 23-25, 27-33, 45-48, 52-53, 64-69, 72; Tailor Dep. at 32-34; Colley Dep. at 10-12).

The same is true about Plaintiff's suspicion or belief that she was singled out or subjected to a practical joke when asked, on two or three occasions, to retrieve a car from the Dealership parking lot with an identification tag that had the wrong keys. Defendants present ample evidence to the contrary -- similarly situated male co-workers also experienced being sent out to retrieve a car with a tag that had the wrong keys attached. (Colley Dep. at 27; Cotto Dep. at 29, 37-38; Patterson Dep. at 55-57, 70-71.) Plaintiff concedes that, despite her suspicion that this was an intentional act or practical joke, Patterson admitted that he made a mistake. Plaintiff concedes that she did not observe Patterson standing around laughing at her as if he had pulled a prank on her. (Pl.'s Dep. at 57-60.)

The majority of Plaintiff's complaints of disparate treatment involve crew leader Patterson. Even if the Court were to consider Plaintiff's subjective beliefs about Patterson's motivation, her testimony is that she believed that Patterson didn't want her working with him because he thought she was after his job and saw that she could do his job better than he could. (Pl.'s Dep. at 60-62.) This is not evidence of gender discrimination or gender-based disparate treatment.

The lack of a separate women's locker room in the older Serra Chevrolet facility where Plaintiff was being trained does not advance Plaintiff's disparate treatment claim. It is undisputed that Greg Brown, the general manager, contacted the builder of the new facility immediately upon learning about Plaintiff's hire and instructed him to change the existing

16

plans so that a women's locker room could be added.  (Brown Dep. at 20-21, 26, 39-41.)
Moreover, there is no evidence that the women's restroom at the older, temporary facility
was insufficiently equal to the men's locker room or that Plaintiff asked and was denied the
opportunity to have her work clothing cleaned by Serra Chevrolet.  *See Vredevelt*, 145 F.
App'x at 130 (observing that the inconvenience of having to change in a women's restroom
as opposed to a women's locker room did "not constitute a materially adverse employment
action.").

Plaintiff's remaining claims of disparate treatment also fail.  Her complaint that co-
workers were reprimanded if they were caught by crew leaders talking to Plaintiff while she
was working and vice versa refutes rather than advances her claim of gender-based
disparate treatment.  (Pl.'s Dep. at 54, 73, 124, 215.)  Her complaint that crew leader
Patterson would sometimes watch her perform a lube technician task on her own rather
than help her (*id.* at 212) is not evidence of disparate treatment absent evidence that he
assisted male trainees under similar circumstances.  And, in light of Plaintiff's testimony
that Serra Chevrolet did not require crew leaders to share their personal power tools with
co-workers, that Plaintiff owned personal power tools but did not want to bring them into
work because she did not want to share them with co-workers, her complaints about crew
leaders Patterson and Cotto sometimes not sharing theirs with her do nothing to advance
her disparate treatment claims (*id.* at 88-90.)

Because Plaintiff cannot establish a *prima facie* case of gender-based disparate
treatment, there is no need to address the issue of pretext.  Even if considered, as

17

discussed below, Plaintiff cannot defeat Defendants' motion for summary judgment on this claim.

### 2.  No Genuine Issue of Fact on Pretext

Defendants have presented ample evidence of legitimate, non-discriminatory reasons for Plaintiff's termination.  (Cotto Dep. at 17-24, 25-27,  31, 33, 35-37, 40-42; Patterson Dep. at 22-23, 24-33, 39-40, 42-43, 44-50, 52-54, 64-68; Tailor Dep. at 32-34, 39-40, 48-50, 59, 63; Brown Dep. at 34-39, 41-42, 44-47.)  Plaintiff, therefore, must come forward with evidence that Defendants' proffered reasons are a pretext for gender discrimination. To satisfy her burden, Plaintiff must present sufficient evidence to permit a reasonable juror to conclude that gender discrimination was a motivating factor for her termination.  Pretext can be established by showing that Defendants' proffered reasons for her termination (1) have no basis in fact, (2) did not actually motivate Defendants' decision to terminate, or (3) are insufficient to warrant her termination.  *Murphy v. Ohio State Univ.*, ___ F. App'x ___, 2013 WL 5878184, *7 (6th Cir. Oct. 31, 2013).

The Sixth Circuit "has adopted the honest belief rule at the pretext stage of the evaluation of discrimination claims."  *Id.*  "'[I]n order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).  "The employer's decision-making process need not be optimal, or leave no stone unturned; '[r]ather, the key inquiry is whether the employer made a

18

reasonably informed and considered decision before taking an adverse employment action.'" *Id.* (quoting *Smith*, 155 F.3d at 807).

Plaintiff argues that Defendants' proffered reasons were pretextual because the charges against her were baseless; and, even if not, termination of her as an "at will" employee was not warranted because she was given verbal as opposed to written reprimands and, contrary to Brown's testimony about general practices, Defendants did not consider Plaintiff for a different position at Serra Chevrolet before terminating her. Plaintiff's arguments lack merit because they ignore that she was an at-will employee who had been verbally reprimanded numerous times for not following company procedures during the first 30 days of her introductory 120 period at Serra Chevrolet.  Plaintiff presents no evidence that a Serra Chevrolet at-will employee still in the introductory 120 day period of employment must receive a written reprimand before being terminated or must have another position explored before being terminated.  Defendants, on the other hand, present undisputed evidence establishing a basis in fact for the proffered reasons for Plaintiff's termination and that these reasons warranted her termination.  Plaintiff has not produced "sufficient evidence from which the jury could reasonably reject [Defendants'] explanation and infer that [Defendants'] . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action."  *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (internal quotation marks and citations omitted).

The Court now considers Plaintiff's Title VII and ELCRA claims of retaliation.

**B.  Retaliation**

19

Plaintiff does not argue that she has direct evidence of retaliation.  Thus, her Title VII and Michigan ELCRA claims of retaliation are analyzed under the same *McDonnell Douglas* burden-shifting analysis described above.  *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013).  *See also Humenny*, 390 F.3d at 906.  To establish a *prima facie* case of reliation, Plaintiff must establish that (1) she engaged in protected activity, (2) Defendants knew of her protected activity, (3) Defendants thereafter took an adverse employment action against her, and (4) there is a causal connection between the protected activity and the adverse employment action.  *Fuhr*, 710 F.3d at 674.

Defendants' motion for summary judgment argues that Plaintiff cannot establish the causation element of her *prima facie* case of retaliation.  This Court agrees.

As the Supreme Court recently clarified in *University of Texas Southwestern Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517 (2013) ("*Nassar*"), "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m) [Title VII's status-based discrimination provision]. This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 2533.  In other words, in this context, but-for causation requires proof that Defendants would not have terminated Plaintiff if she had not made a complaint about gender discrimination.

The issue before the Court in *Nassar* was "the proper standard of causation for Title VII retaliation claims." *Id.* at 2524.  After examining Title VII's structure and differences in statutory language for status-based discrimination claims, i.e., gender, as opposed to claims of retaliation, the Court concluded that, just like claims under the ADEA with similar

20

"because of" language, "the proper conclusion here . . . is that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* at 2528.  It distinguished this causation standard from that applied to status-based discrimination claims:

> An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act.  So-called but-for causation is not the test.  It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.

*Id.* at 2522-23.

The Court noted the importance of properly construing the causation standard for Title VII retaliation claims, especially in light of the "ever-increasing frequency" of these claims and their impact on the "fair and responsible allocation of resources in the judicial and litigation systems."  *Id.* at 2531.  The Court further noted that "lessening the causation standard could also contribute to the filing of frivolous claims, which would siphon resources from efforts by employer, administrative agencies, and courts to combat workplace harassment."  *Id.*  It explained:

> Consider in this regard the case of an employee who knows that he or she is about to be fired for poor performance, given a lower pay grade, or even just transferred to a different assignment or location.  To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation.  If respondent [employee] were to prevail in his argument here, that claim could be established by a lessened causation standard, all in order to prevent the undesired change in employment circumstances.  Even if the employer could escape judgment after trial, the lessened causation standard would make it far more difficult to dismiss dubious claims at the summary judgment stage. It would be inconsistent with the structure and operation of Title VII to so raise the costs, both financial and

21

reputational, on an employer whose actions were not in fact the result of any discriminatory or retaliatory intent.

*Id.* at 2532 (internal citation omitted).

Although neither party addresses the Supreme Court's recent decision in *Nassar*, this Court applies the correct "but-for" causation standard to Plaintiff's retaliation claims as instructed by the Supreme Court.

Plaintiff relies on inferences drawn from the temporal proximity of her termination to two events to establish the but-for causation element of her retaliation claims: (1) she was terminated a few weeks after the December 19, 2011 meeting where she claims she told her immediate supervisor, Tailor, that she believed she was being treated unfairly by Patterson because of her gender; and (2) she was terminated the same day that Tailor told Brown about her insubordination and that he had heard from co-worker Colley that Plaintiff might be "setting up" Serra Chevrolet to be sued. This is not enough to create a genuine issue of fact on the but-for causation element of Plaintiff's *prima facie* case of retaliation.

First, Plaintiff's reliance on *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516 (6th Cir. 2008), is misplaced. *Mickey* was an ADEA case decided in 2008, before the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 174 (2009), holding that all ADEA claims are analyzed under a "but-for" causation standard. In *Gross*, the Supreme Court clarified that, "[u]nlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." *Id.* The *Mickey* court applied the less-stringent "motivating-factor" causation standard to the plaintiff's ADEA retaliation claim. Subsequent Supreme Court precedent in *Gross* and

*Nassar* undermines the holding in *Mickey* that "where an employer fires an employee immediately after learning of a protected activity," an inference of "a causal connection between the two actions" is allowed, "even if [the plaintiff] ha[s] not presented other evidence of retaliation." *Mickey*, 516 F.3d at 525. Under the stricter "but-for" causation standard, temporal proximity, standing alone, is not enough. This principle was observed by the *Mickey* court when it applied the "higher standard for causation" required for retaliation claims under the ELCRA as opposed to the ADEA, i.e., that the employee's "participation in activity protection by the [EL]CRA was a 'significant factor' in the employer's adverse employment action." *Id.* at 527-28. There, the *Mickey* court observed that the plaintiff must show more than just temporal proximity to establish a claim of retaliation. *Id.* at 523 n.2, 527-28. Thus, applying the teachings of *Nassar* and *Gross* here, temporal proximity alone is not enough to allow a reasonable inference of "but-for" causation, an essential element of Plaintiff's Title VII and ELCRA retaliation claims.[1] Other than the temporal proximity between Plaintiff's protected activity -- her complaint of gender-based disparate treatment at the December 19, 2011 meeting with Tailor and Patterson --

---

[1]The ELCRA's retaliation provisions have the same "because" language deemed crucial to the Supreme Court's conclusion that "but-for" causation is required for Title VII retaliation claims. Specifically, the ELCRA provides, in pertinent part, that:

Two or more persons shall not conspire to, or a person shall not:

(a) Retaliate or discriminate against a person <u>because</u> the person has opposed a violation of this act, or <u>because</u> the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

Mich. Comp. Laws § 37.2701(a) (emphasis added).

23

and her termination, Plaintiff presents no evidence that "but-for" Defendants' desire to retaliate against her for that protected activity she would not have been terminated.

Second, Plaintiff presents no evidence that she was considering a Title VII lawsuit before she was terminated, that she told co-worker Colley that she was, or that she reported to anyone at Serra Chevrolet that she was contemplating a gender-based discrimination lawsuit against Defendants. There is no deposition testimony or other evidence showing that Plaintiff had engaged in protected activity of that sort. There is only Colley's speculation that Plaintiff was "setting up" her employer for a lawsuit. Thus, it would require further impermissible layering of speculation upon speculation to infer that Defendants terminated Plaintiff out of retaliation because they thought she was contemplating a lawsuit for gender discrimination. This is not the sort of evidence that allows a reasonable inference that "but-for" Defendants' desire to retaliate against Plaintiff for protected activity she would not have been terminated. Rather, Defendants present ample, undisputed evidence otherwise -- that problems with Plaintiff's job performance and her status as an at-will employee only 30 days into her 120-day introductory period at Serra Chevrolet were the "but-for" cause for Defendants' decision to terminate Plaintiff.

Because Plaintiff fails to satisfy her burden on the but-for causation element of her *prima facie* case of retaliation, there is no need to address the issue of pretext. Even if considered, Plaintiff cannot defeat Defendants' motion for summary judgment on her retaliation claims. Plaintiff has not presented evidence that would permit a reasonable juror to conclude that Defendants' legitimate, non-discriminatory reasons for her termination were a pretext for retaliatory animus. Plaintiff's pretext arguments duplicate those

presented in support of her gender-based discrimination claims and fail for the same reasons discussed above.[2]

## IV.  Conclusion

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  March 6, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 6, 2014, by electronic and/or ordinary mail.


s/Johnetta M. Curry-Williams
Case Manager
Acting In Absence of Carol A. Hemeyer

---

[2]In light of the Court's ruling on Plaintiff's gender-based disparate treatment and retaliation claims, there is no need to address Defendants' additional argument that Defendant Tailor cannot be held individually liable under either Title VII.